UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

| | | |
|---|---|---|
| | : | |
| DACETA SIMPSON, | : | **Civil Action 05 -CV- 5144 (GAY)** |
| | : | |
| **Plaintiff,** | : | |
| | : | **DEFENDANTS' STATEMENT** |
| **vs.** | : | **UNDER RULE 56.1 IN SUPPORT** |
| | : | **OF MOTION FOR SUMMARY** |
| THE ENLARGED CITY SCHOOL DISTRICT | : | **JUDGMENT** |
| OF NEWBURGH , et. al., etc. | : | |
| | : | |
| **Defendants.** | : | |

—————————————————————————

Defendants, by their attorneys, Shaw & Perelson, LLP, in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, submit the following statement under Local Rule 56.1.

1. Plaintiff, a Black female teacher, was employed by the defendant Newburgh Enlarged City School District (hereinafter "District") as a probationary special education teacher from in or about October of 2001 until her denial of tenure and termination by the District effective August 1, 2004. *Amended Complaint ¶¶ 1, 5, 36*; *Transcript of Deposition Testimony of Plaintiff at pages 13 and 37*; *Defendants Exhibit III attached to the Affirmation of Mark C. Rushfield as Exhibit C thereto*.

2. The plaintiff filed an Amended Complaint in this action on or about October 5, 2005 , in which she asserts that at some point during the plaintiff's career, defendant Cheryl Bivona ( "Bivona") concluded that the plaintiff was the worst teacher she had seen in 25 years within the District, that that conclusion was "influenced by bias against plaintiff on the basis of race," that " Bivona's conclusion influenced other professionals in the school district to dismiss plaintiff's capacity as a classroom teacher," that "Bivona's comments, which were hostile to plaintiff on the basis of her race, significantly tainted the defendant district's treatment and review of the plaintiff

," that"Defendant Bivona acted as she did toward plaintiff out of animosity and bias based on her race," that "Defendant school district substantially under-employs minorities, particularly minorities of the Black race, in teaching positions within its district," that "[s]uch under-employment is the consequence of intentional racial discrimination both in hiring and the terms and conditions of employment of such teachers of color." *Amended Complaint ¶¶ 37, 38, 39, 40, 50, 53 and 54.*

3. The plaintiff's Amended Complaint asserts two causes of action, each alleging discrimination based upon the race of the plaintiff, i.e., at paragraph 57 of the Amended Complained that "Defendant district has failed to accord the same terms and conditions the plaintiff as it did to non-black teachers and thereby violated 42 U.S.C. sec. 1981" and at paragraph 58 of the Amended Complaint that "[b]y discriminating against plaintiff on the basis of her race, defendants violated the 14th Amendment to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. section 1983." *Amended Complaint ¶¶ 57 and 58.*

4. The plaintiff contends that Bivona acted as she did towards the plaintiff out of animosity and bias based upon her race. *Transcript of Deposition Testimony of Plaintiff at page 14.*

*5.* The plaintiff contends that only four persons employed by the District were motivated to act towards her in the way that they did because she is a Black person: Bivona, Joseph Raiti (a principal at Heritage Jr. High School [" Heritage"] ), Lisa Nazzaro, and Elaine Da Silva (a teachers aide at Heritage). *Transcript of Deposition Testimony of Plaintiff at pages 13-17.*

6. The plaintiff was interviewed and recommended for hire by Heritage Principal Joan Goudy-Crosson, a Black woman as dark in complexion as the plaintiff, and commenced employment at Heritage in or about October of 2001 in a 12:1:1 or 1:12:1 (i.e.,12 students, one teacher, one teacher's aide) special education class. *Transcript of Deposition Testimony of Plaintiff at pages 13,*

*19-20, 37 and 40*; *Cheryl Bivona Affidavit ("Bivona Affidavit") at ¶ 3*; *Transcript of Deposition Testimony of Tameka Gregg at page 11; Transcript of Deposition Testimony of Cheryl Bivona at page 16* .

7. In Plaintiff's  Response to Defendants' Request for Interrogatories dated May 18, 2006, the plaintiff identified (1 )Tamika (sic) Gregg as a person with knowledge of the defendants'  bias against the plaintiff on the basis of her race , (2) Oneka Elli (sic) as a person with knowledge of the defendants'  bia against the plaintiff, and others, on the basis of race, (3) Alfreda Robinson as a person with knowledge of the defendants' bias against the plaintiff on the basis of her race, (4) Christian (sic) Saccoh as a person with knowledge that defendant Bivona was hostile towards plaintiff on the basis of her race, (5) Laurie Colacchio as a person with knowledge that the defendants discriminated against the plaintiff in the terms and conditions of her employment by failing to provide her support needed to discharge her duties and of the defendants' bias against the plaintiff on the basis of her race, and  (6) Octavia Nicholas as a person with knowledge of the defendants' bias against the plaintiff on the basis of race and that plaintiff and her students were excluded from the Y2K Career Day due to that bias.  *Plaintiff's Response to Defendants' Request for  Interrogatories attached to the Affirmation of Mark C. Rushfield as Exhibit A thereto.*

8. Tameka Gregg, a Black woman, was hired to work at Heritage as a special education teacher at or about the same time as was the plaintiff and worked across the hall from the plaintiff. *Transcript of Deposition Testimony of Plaintiff at page 38; Bivona Affidavit at ¶ 5; Transcript of Deposition Testimony of Tameka Gregg at pages 7-9.*

9. As Director of Special Education, Bivona interviewed and hired Tameka Gregg, to serve as a special education teacher in a 15:1 special education class in the same school as the plaintiff.

Bivona was very impressed with Gregg and essentially offered Gregg the job immediately upon the conclusion of the interview. *Bivona Affidavit at ¶ 5; Transcript of Deposition Testimony of Tameka Gregg at pages 9, 20-21 and 25.*

10. Tameka Gregg and the plaintiff were the only two non-tenured Black special education teachers employed in the District during the 2001-2002 school year. *Transcript of Deposition Testimony of Cheryl Bivona at pages 19-20.*

11 . Bivona became the District's Director of Special Education in July of 2001. *Transcript of Deposition Testimony of Cheryl Bivona at page 17.*

12. Prior to September of 2001, from about 1993, Bivona had been involved in hiring for preschool special education, including the hiring of a school psychologist, a speech therapist, a special education evaluator and preschool special education teachers. *Transcript of Deposition Testimony of Cheryl Bivona at page 18.*

13. Bivona was involved in preparing Teacher Evaluation Reports for Tameka Gregg for the 2001-2002 school year with two different principals, Joan Goudy-Crosson and her replacement late in that school year, Joseph Raiti. *Bivona Affidavit at ¶ 7.*

14. Heritage Principal Goudy-Crosson and Bivona agreed that Tameka Gregg was an excellent special education teacher in all respects and in her Teacher Evaluation Report for September 2001 to January 2002, they agreed and determined that she deserved grades of 4 and 5 (with 5 being the highest grade a teacher can receive and 2 being the lowest grade a teacher who was observed as to the graded criteria can receive). *Bivona Affidavit at ¶ 7 and Exhibit A thereto; Transcript of Deposition Testimony of Tameka Gregg at pages 12-14; Defendant Exhibit Gregg A attached to the Affirmation of Mark C. Rushfield as Exhibit G thereto.*

15. Joan Goudy-Crosson left as principal of Heritage in or about February or March of 2002 and was replaced by Joseph Raiti. *Bivona Affidavit at ¶¶ 7 and15; Transcript of Deposition Testimony of Plaintiff  at page 86; Transcript of Testimony of Tameka Gregg at pages 11-12.*

16.  Heritage Principal  Raiti and Bivona  agreed and determined that Tameka Gregg continued to be an excellent special education teacher in all respects during the second half of the 2001-2002 school year  and in Tameka Gregg's Teacher Evaluation Report for January of 2002 through to the end of the 2001-2002 school year, Mr. Raiti and Bivona  agreed and determined to give her grades of 4 and 5, though this time she received mostly 5s.  *Bivona Affidavit at ¶ 8 and Exhibit B thereto; Transcript of Deposition Testimony of Tameka Gregg at pages 14-17; Defendant Exhibit Gregg B attached to the Affirmation of Mark C. Rushfield as Exhibit H thereto.*

17. Both Bivona and Raiti wanted Tameka Gregg to continue as a special education teacher at Heritage at the conclusion of the 2001-2002 school year, but she left the  District for a better paying and more geographically convenient position with the Poughkeepsie City School District for the following school year.  *Bivona Affidavit at ¶ 8; Transcript of Deposition Testimony of Tameka Gregg at pages 22, 23  and 25.*

18. Tameka Gregg neither experienced nor was exposed to any racial bias from Bivona, Raiti or the District. *Transcript of Deposition Testimony of Tameka Gregg at pages 8, 10, 12 and 23.*

19. Tameka Gregg has no knowledge of any bias by either Bivona or the District against the plaintiff either because the plaintiff is Black or because she is Jamaican.  *Transcript of Deposition Testimony of Tameka Gregg at page 8.*

20.  The plaintiff told Tameka Gregg that the plaintiff had problems with her students and that she felt she wasn't getting enough support, but Tameka Gregg did not find that to be a problem for

Tameka Gregg, who found that she received the support of other teachers, teacher assistants, the principal and of Bivona. *Transcript of Deposition Testimony of Tameka Gregg a pages 17 and 22* .

21. Nothing at Heritage led Tameka Gregg to conclude that there was any policy or practice of the District or of  Heritage of racial discrimination against any staff members, of not wanting to hire Black teachers or not wanting to keep Black teachers, and she did not experience anything which indicated to her that her race played any role in how she was treated by either staff or administrators. *Transcript of Deposition Testimony of Tameka Gregg at page 23.*

22. Bivona performed formal classroom observations of Tameka Gregg during her year of employment at Heritage and Tameka Gregg had no objections to how Bivona comported herself during those observations, felt that Bivona gave her great feedback concerning the classroom observations Bivona performed , felt her observations by Bivona were fair to her and was happy with them. *Transcript of Deposition Testimony of Tameka Gregg at pages 12-17* .

23. Tameka Gregg, as well as other special education teachers at Heritage,  communicated to the plaintiff during the 2001-2002 school year that the formal classroom observations performed by Bivona in their classes led them to conclude that they had had good post-observation discussions with Bivona, that Bivona had been friendly to them and that Bivona was "great." *Transcript of Deposition Testimony of Plaintiff at pages 72-74, 76 and 78.*

24.   Christina Saccoh ("Saccoh") is a tenured Black special education teacher employed at Heritage Jr. High School for about ten years as of her deposition on June 29, 2006. *Transcript of Deposition Testimony of Christina Saccoh at pages 5, 7 and 8.*

25. Saccoh possesses no information that would lead her to conclude that Bivona  had any bias against Black people or against the plaintiff because of her race. *Transcript of Deposition*

*Testimony of Christina Saccoh a pages 16-17.*

26. Saccoh has known Joseph Raiti, the Principal at Heritage since he began working as principal at that school. *Transcript of Deposition Testimony of Christina Saccoh at pages 6-7.*

27. Joseph Raiti never demonstrated any animus against Saccoh based upon her race and she never witnessed him demonstrating racial animus towards anyone else. *Transcript of Deposition Testimony of Christina Saccoh at pages 7-8.*

28.  Saccoh possesses no information that would lead her to conclude that Raiti had any bias against Black people or against the plaintiff because of her race. *Transcript of Deposition Testimony of Christina Saccoh a pages 16-17.*

29. Bivona was a contributing evaluator for the Teacher Evaluation Reports for Saccoh for the 2000-2001 and 2001-2002 school years, the latter of which included Joseph Raiti as an evaluator, and Bivona contributed various positive comments about Saccoh that were placed on her Teacher Evaluation Reports. *Transcript of Deposition Testimony of Christina Saccoh at pages 11-15.*

30. Saccoh received 4s on her Teacher Evaluation Report for the 2000-2001 school year and 4s and 5s on her Teacher Evaluation Report for the 2001-2002 school year, had no complaints or concerns about those evaluations and believed they were fair. *Transcript of Deposition Testimony of Christina Saccoh at pages 12 -13 and Defendant Exhibit Saccoh A attached to the Affirmation of Mark C. Rushfield as Exhibit I thereto.*

31. Bivona performed formal classroom observations of Saccoh at Heritage and Saccoh believed those observations were fair; she had no disputes with the Observation Reports that Bivona issued on those observations. *Transcript of Deposition Testimony of Christina Saccoh at page 17.*

32. Oneka Ellis ("Ellis") is a Black woman from St. Thomas in the Caribbean, has been employed by the District as a special education teacher since September of 1998 and received tenure in that position from the District in 2001. *Transcript of Deposition Testimony of Oneka Ellis at pages 5-7.*

33. Ellis was never the subject of discrimination or bias by the District based upon either her race or her Caribbean background. *Transcript of Deposition Testimony of Oneka Ellis at page 27.*

34. Ellis has no knowledge of the District or Bivona discriminating against anyone because of their race. *Transcript of Deposition Testimony of Oneka Ellis at page 14 .*

35. Bivona did a formal classroom observation of Ellis, which Ellis considered to have been fair and for which she had no complaints. *Transcript of Deposition Testimony of Oneka Ellis at page pages 14-15.*

36.   Bivona was a contributing evaluator  for the Teacher Evaluation Reports for Ellis for her  non-tenured 2000-2001 school year  and tenured 2001-2002 and 2002-2003 school years, and Bivona or the special education department of which  Bivona was the Director contributed various positive comments about Ellis that were placed on her Teacher Evaluation Reports. *Transcript of Deposition Testimony of Oneka Ellis at pages 15-24 and Defendant Exhibit Ellis A attached to the Affirmation of Mark C. Rushfield as Exhibit J thereto.*

37. In her 2001-2002 school year Teacher Evaluation Report for her final non-tenured year, Ellis received straight 5s as her grades and had no objections or complaints concerning that Report. *Transcript of Deposition Testimony of Oneka Ellis at pages 18-20 and 23-24 and Defendant Exhibit Ellis A.*

38. In the Teacher Evaluation Report for her first tenured school year of 2002-2003, Ellis

received straight 4s, except for an unsatisfactory 3 on two criteria, but did not believe she got the 3s or 4s because of either her Caribbean national origin or her Black race; she understood she received the 3s on two criteria because students in her class did not pass certain exams. *Transcript of Deposition Testimony of Oneka Ellis at pages 20- 22 and Defendant Ellis Exhibit A.*

39. Alfreda Robinson ("Robinson") is a Black special education teacher employed by the District for 18 years and Bivona has served as her "boss" for approximately 10 of those years. *Transcript of Deposition Testimony of Alfreda Robinson at pages 6 and 8-9.*

40. Robinson has no information which would lead her to conclude that either Bivona  or former District Superintendent of Schools Dr. R. Nick Johns had any bias against any Black people because of their race; nor does she possess any knowledge as to whether the District engaged in any effort to avoid hiring Black people or used race as a basis for tenure decisions. *Transcript of Deposition Testimony of Alfreda Robinson at pages 15-16 and 18-22.*

41. Bivona was an evaluator or  contributing evaluator in the Teacher Evaluations of Robinson for the 2001-2002, 2002-2003 and 2003-2004school years and on the Teacher Evaluation Reports for each of those school  years, Robinson received straight 5s as her grades. *Transcript of Deposition Testimony of Alfreda Robinson at pages 17-18 and Defendant Robinson Exhibit A attached to the Affirmation of Mark C. Rushfield as Exhibit K thereto.*

42.  Lauri Colacchio ("Colacchio") has held the position of head delegate of the Newburgh Teachers' Association for the District's Meadow Hill Elementary School, starting in October of the year that the plaintiff commenced employment at the District's Meadow Hill Elementary School. *Transcript of Deposition Testimony of Lauri Colacchio at page 6.*

43. Colacchio has no information that would lead her to conclude that either Bivona or the

principal at the Meadow Hill Elementary School while the plaintiff was employed there, Dr. Johnetta Neal, had any bias against the plaintiff on the basis of the plaintiff's race; she has no knowledge that anyone at the District discriminated against the plaintiff because she is Black. *Transcript of Deposition Testimony of Lauri Colacchio at pages 7-8 and 33.*

44. Octavia Nicholas ("Nicholas") is a Black woman employed as a general education teacher by the District since 1997 who became tenured in that position in 1999, who works at Meadow Hill Elementary School and who worked there when the plaintiff and Principal Neal were employed there (i.e., 2003-2004 school year). *Transcript of Deposition Testimony of Octavia Nicholas at pages 5-6 and 16.*

45. Y2K Career Day is a field trip sponsored by a local community organization where children go to different centers, which Nicholas attended as the only Black teacher in the sixth grade when that grade went on this field trip. *Transcript of Deposition Testimony of Octavia Nicholas at page 12.*

46. Nicholas is not involved in the scheduling of the Y2K Career Day field trip, does not know whether the plaintiff or her students were or were not included in that field trip, and has no knowledge as to the plaintiff being excluded from it. *Transcript of Deposition Testimony of Octavia Nicholas at pages 11 and 16 .*

47. Nicholas has no knowledge of the District having any bias against the plaintiff on the basis of her race or of the plaintiff's race playing any role in whether or not she was invited or not invited to attend the Y2K Career Day field trip. *Transcript of Deposition Testimony of Octavia Nicholas at page 16.*

48. In addition to Nicholas, other Black teachers, including other Black teachers at Meadow

Hill Elementary School, took their classes on the Y2K Career Day field trip. *Transcript of Deposition Testimony of Plaintiff at pages 267-268.*

49. Unlike individual school administrators, i.e. principals and assistant principals, as Director of Special Education, Bivona could not enter and sit in a classroom unannounced for an unplanned observation. *Bivona Affidavit at ¶11.*

50. As Director of Special Education , Bivona generally did one formal classroom observation each school year of special education teachers in the Special Education Department . The other formal classroom observations were performed by the administrators (i.e. principal and assistant principals) at the school. *Bivona Affidavit at ¶12.*

51. Bivona  performed her first formal classroom observation of the plaintiff on October 9, 2001, which was scheduled weeks in advance with the plaintiff and the plaintiff and Bivona had met to discuss this observation before it was performed. *Bivona Affidavit at ¶12; Transcript of Deposition Testimony of the Plaintiff at pages 52-53; Transcript of Deposition Testimony of Cheryl Bivona at pages 23-24.*

52. Prior to this October 9, 2001 formal classroom observation, Bivona had neither said nor done anything which led the plaintiff to believe that Bivona had any bias against Black people. *Transcript of Deposition Testimony of the Plaintiff at page 52.*

53. A formal observation and the resulting Observation Report, as opposed to a Teacher Evaluation Report, are required to be limited to what is actually observed during the class that is observed.  Problems observed on other occasions, for example, cannot be made part of the observation or Observation Report . Consequently, the purpose of the observation and Observation Report is to permit the observer to provide information and highlight issues that may assist the

11

observed teacher in improving her performance, not to create a record of performance issues. *Bivona Affidavit at ¶12; Neal Affidavit at ¶19 and Exhibit I thereto; Transcript of Deposition Testimony of the Plaintiff at pages 64-65.*

54. As reflected by the Observation Report Bivona prepared from her first observation of the plaintiff, though the plaintiff was required to have a lesson plan available for Bivona at the commencement of her observation, from which she was to teach, and for Bivona to review, there was no such plan provided by her to Bivona. *Bivona Affidavit at ¶13 and Exhibit D thereto; Transcript of Deposition Testimony of the Plaintiff at page 65.*

55. As reflected by the Observation Report Bivona prepared from her first observation of the plaintiff, the plaintiff made a point during the class of requesting that students follow classroom rules concerning not speaking out of turn, but students nonetheless spoke out of turn. *Bivona Affidavit at ¶13 and Exhibit D thereto.*

56.   As reflected by the Observation Report Bivona prepared from her first observation of the plaintiff, Bivona had concerns regarding the lesson being presented as a group lesson, rather than one which was individualized to the needs of the individual special education students she was instructing and regarding the lesson not being multi-sensory, i.e., not involving activities that involve multiple senses of the students. *Bivona Affidavit at ¶13 and Exhibit D thereto.*

57.   The need for individualized instruction rather than a group lesson was particularly important in this class, which was the only class of its type at Heritage,  since this 12:1:1 class which had been assigned to the plaintiff was made up of special education students who not only had individualized needs, but were in three different grade levels, i.e. seven, eighth and ninth grades and each student was at least three years below grade level. *Bivona Affidavit at ¶13; Transcript of*

12

*Deposition Testimony of Cheryl Bivona at page 67.*

58. The plaintiff did not disagree with the comments made on her first Observation Report that: "The students require a multi-sensory approach to learning in order to retain information" and "[t]hey need small, meaningful bits of information in order to process and retain. This population also needs all modalities involved in the learning process.  The lessons presented must be meaningful yet reflect the 7th, 8th, and 9th grade curriculum." *Bivona Affidavit at ¶13 and 14 and Exhibit D thereto; Transcript of Deposition Testimony of the Plaintiff at pages 66-70.*

59. The plaintiff considered Bivona's Observation Report based upon her October 9, 2001 formal classroom observation of the plaintiff to be fair and she did not believe anything in it was motivated by any bias against the plaintiff based upon her race. *Transcript of Deposition Testimony of the Plaintiff at pages 57-58.*

60. The plaintiff understood that in signing documents like an Observation Report, that would reflect her agreement to its contents unless, and then only to the extent, she made comments disagreeing with statements in the Observation Report. *Transcript of Deposition Testimony of the Plaintiff at pages 349-351.*

61. The plaintiff claims that Bivona did not do a post-observation conference with her following her October 9, 2001 formal classroom observation, but she did not think at the time of the observation that this lack of a post-observation conference was a consequence of racial bias by Bivona; she later concluded that this lack of a post-observation conference was evidence of an anti-Black bias by Bivona against her when she learned from non-tenured Black special education teacher Tameka Gregg, and from a couple of other special education teachers, that Bivona had engaged in very positive post-observation conferences with them following their formal classroom observations.

13

*Transcript of Deposition Testimony of the Plaintiff at pages 69-70 and 72-78.*

62. The plaintiff received a Teacher Evaluation Report as a probationary (non-tenured) teacher for the period of September 2001 through January 2002 and asserts that she had received an initial Teacher Evaluation Report for that time period (which may have been unsigned) which reflected grades of 1 for multiple criteria, which was subsequently reissued/corrected to reflect grades of 2 in all criteria, because a grade of one is based upon their having been no observation made of the teacher. *Transcript of Deposition Testimony of the Plaintiff at pages 78-80; Neal Affidavit at Exhibit O.*

63.  In the plaintiff's Teacher Evaluation Report as a probationary (non-tenured) teacher, for the period of September 2001 through January of 2002 signed by Bivona and Heritage Principal Goudy-Crosson, they  agreed and determined that the plaintiff would receive the lowest possible grade for an observed teacher, i.e., a 2, in every category. *Bivona Affidavit at ¶10 and Exhibit C thereto..*

64. As reflected in the plaintiff's Teacher Evaluation Report for the period of September 2001 through January of 2002, the primary concerns commented upon by Principal Goudy-Crosson and Bivona were with regard to instruction and classroom management. *Bivona Affidavit at ¶11 and Exhibit C thereto.*

65.  Concerning the issue of classroom management, the grades and comments in the plaintiff's Teacher Evaluation Report for the period of September 2001 through January of 2002 were primarily based upon information provided by Principal Goudy-Crosson who, as the principal of the school, had the most exposure to that issue and the primary concern for that issue. *Bivona Affidavit at ¶11.*

66. Though the plaintiff's Teacher Evaluation Report for the period of September 2001 through January of 2002 which graded her as "2" in all criteria had a place that the plaintiff could check if she wished to submit comments, the plaintiff did not do so and did not submit any response to this Teacher Evaluation Report. *Transcript of Deposition Testimony of the Plaintiff at pages 90-92; Bivona Affidavit at Exhibit C.*

67. While serving as principal at Heritage, Principal Goudy-Crosson filed a letter in the plaintiff's personnel file reporting that she had received parental complaints about how the plaintiff was managing her class. *Transcript of Deposition Testimony of the Plaintiff at pages 206-207.*

68. Ms. Goudy-Crosson ceased serving as principal of Heritage Jr. High School in or about February of 2002, as a result of which, Bivona did the second formal classroom observation of the plaintiff rather than the principal on April 26, 2002. *Bivona Affidavit at ¶15 and Exhibit E thereto.*

69. As reference to the April 26, 2002 Observation Report portrays, the lesson on that day was about working with money. The observation of this class, in which only about half the students enrolled in the class were present, was generally positive, particularly concerning the plaintiff's use of a multi-sensory game approach. It was, however, another non-individualized whole group lesson. Furthermore, throughout the lesson, the plaintiff commonly used the term "note" for "dollar" which Bivona perceived to be confusing to these special education students, who were, obviously to Bivona, not familiar with such a term for American currency. *Bivona Affidavit at ¶15 and Exhibit E thereto.*

70. In the April 26, 2002 Observation Report, Bivona also commented upon a number of occasions in which the dialect of the plaintiff appeared to Bivona to make it difficult for the special education students, who require instruction through a very clear and concise sentence structure, to understand the plaintiff. *Bivona Affidavit at ¶15 and Exhibit E thereto.*

15

71. Apart from the dialect problem raised in the observation, the plaintiff made and had no objection to any of the comments by Bivona in the April 26, 2002 Observation Report. *Bivona Affidavit at ¶15 and Exhibits E and G thereto; Transcript of Deposition Testimony of Plaintiff at page 111.*

72. Following the receipt by Bivona of the plaintiff's comments concerning the April 26, 2002 observation, Bivona and the plaintiff had a pleasant conversation in which Bivona explained that she considered the terms that the plaintiff had used during the observed lesson to be confusing for the children, such as the use of notes for dollars, and that the plaintiff did not always speak in full sentences when addressing the children. *Transcript of Deposition Testimony of Cheryl Bivona at pages 34-35.*

73. The plaintiff has acknowledged in her testimony that during the April 26, 2002 lesson on money that she presented to her special education students, which Bivona observed, she did refer to "dollars" as "notes." *Transcript of Deposition Testimony of Plaintiff at pages 101-102.*

74. The plaintiff spoke to special education teacher Oneka Ellis following her April 26, 2002 observation concerning the resulting Observation Report and confirmed that she had not used American English in referring to a monetary denomination (i.e., notes) that is not used in the United States. Ellis helped her to rewrite the lesson using normal American English and showed her how the plaintiff's use of non-American English could create understanding problems for her special education students. Simpson nonetheless expressed her feeling to Ellis that the reference to her misuse of a monetary term by Bivona in the Observation Report represented some kind of cultural discrimination or bias. *Transcript of Deposition Testimony of Oneka Ellis at pages 9-14.*

75. Bivona held both a pre-observation conference and post- observation conference with the

plaintiff concerning her April 26, 2002 formal classroom observation. *Transcript of Deposition Testimony  of Plaintiff at pages 100 and 122.*

76. During the plaintiff's first year at Heritage Jr. High School, there were parental complaints about how the plaintiff handled her class, including one by a parent who had observed the class being taught by the plaintiff and made an objection to Bivona as to her classified son, C.H., being placed in the plaintiff's class because the parent perceived that there was no classroom control and one by a parent of a student already in the class ; Bivona, new Heritage Principal Raiti and CSE Sub-Chair Toby Zodicoff , who was locally in charge of special education at Heritage, communicated these complaints to the plaintiff. *Bivona  Affidavit at ¶¶ 18 and 22*; *Transcript of Deposition Testimony of Plaintiff at pages 164-165;169-170 and 172-173;Transcript of Deposition Testimony of Cheryl Bivona at pages 31-32 and 38-39.*

77. In May of 2002, the plaintiff was provided with the Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002, performed by Heritage's new principal, Joseph Raiti, and Bivona. *Bivona  Affidavit at ¶ 16 and Exhibit F thereto.*

78.  In this Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002, the plaintiff received grades of 3 (rather than the 2s she had received in her prior Teacher Evaluation Report), still a  below standard grade, in each category. *Bivona Affidavit at ¶ 16 and Exhibit F thereto; Affidavit of Dr. Johnetta Neal at Exhibit O.*

79. In agreeing to the Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002,  Bivona acquiesced in Principal Raiti's position concerning both the grades and the comments placed on the Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002 because as the principal of the school he was generally in a

17

better position than Bivona to judge the plaintiff's performance. *Bivona  Affidavit at ¶ 16* .

80. The comments in the plaintiff's January 2002 through June 2002 Teacher Evaluation Report concerning classroom management (i.e., "General order and student discipline is not at the level desired especially when the 1:12:1 ratio is fixed") came solely from Mr. Raiti. *Bivona Affidavit at ¶ 17.*

81. As of the date of the issuance of the Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002, Bivona did have concerns of her own about the plaintiff's teaching ability with regard to differentiating instruction among her students (i.e., as opposed to group lessons) and also had concerns about her classroom management abilities based upon the letters that she had received from parents about that issue. *Transcript  of Deposition Testimony of Cheryl Bivona at pages 37-39,*

82.  The Teacher Evaluation Report for the plaintiff for the period January of 2002 through June of 2002 incorporated  Bivona's expression that daily multi-sensory lesson plans were essential for the special education students the plaintiff was teaching and the view of both Principal Raiti and Bivona that it was important that Ms. Simpson not use terminology other than that applicable to American English (e.g., notes instead of dollars). *Bivona  Affidavit at ¶ 16 and Exhibit F thereto*.

83. In the 2002-2003 school year, consistent with normal practice, Bivona performed a single formal preannounced classroom observation of the plaintiff at Heritage, which occurred on November 20, 2002 and which was followed by a post-observation conference. *Bivona  Affidavit at ¶ 19 and Exhibit H thereto; Transcript of Deposition Testimony of Plaintiff at page 183*.

84. The November 20, 2002 formal classroom observation was a good observation for the plaintiff and the resulting Observation Report by Bivona for the November 20, 2002 formal

classroom observation of the plaintiff  pleased the plaintiff.  *Bivona Affidavit at ¶ 19 and Exhibit H thereto; Transcript of Deposition Testimony of Plaintiff at pages 183-184.*

85. The plaintiff acknowledges that the November 20, 2002 Observation Report does not indicate that Bivona was engaging in actions against the plaintiff based on her race. *Transcript of Deposition Testimony of Plaintiff at page 184.*

86. A Teacher Evaluation Report was prepared for the plaintiff for the period of September 2002 to January of 2003 by Heritage Assistant Principal Gail Tummarella and Bivona because she and Bivona had each performed a formal classroom observation of the plaintiff during the first half of that school year.  Between the two of them, they agreed to an evaluation that graded the plaintiff higher than she had ever been graded before, providing her with the standard grade of 4 out of 5 in more than half of the criteria examined, though below standard grades of 3 in 13 different areas. *Bivona  Affidavit at ¶ 20 and Exhibit L thereto.*

87. *Bivona* believed that the plaintiff's performance had improved based upon her own one-half hour formal classroom observation of the plaintiff and her review of Gail Tummarella's Observation Report for the plaintiff, but both of these administrators still had concerns about her performance as reflected by below standard grades of 3 in 13 different areas. *Bivona  Affidavit at ¶ 20 and Exhibit L thereto*

88. The plaintiff signed the September 2002 to January 2003 Teacher Evaluation Report and provided a response which expressed disagreement with only two of the 13 grades of 3 that she received, i.e., concerning items numbered 11 and 21. *Bivona Affidavit at ¶ 21 and Exhibit M thereto;  Transcript of Deposition Testimony  of Plaintiff at page 194.*

89.  During the 2002-2003 school year, the plaintiff's teacher's aide, Elaine DaSilva

19

("DaSilva") telephoned Bivona to express her concerns about the plaintiff, including that she had seen the plaintiff verbally abusing her students. *Transcript of Deposition Testimony of Cheryl Bivona at pages 57-58 and 62.*

90. On or about March 3, 2003, Heritage Principal Raiti provided to the plaintiff a typewritten signed statement by DaSilva which detailed incidences DaSilva claimed to have witnessed in the plaintiff's classroom between September of 2002 and March of 2003. *Transcript of Deposition Testimony of Plaintiff at pages 200-201; Deposition Exhibit MMM, annexed to the Affirmation of Mark C. Rushfield as Exhibit B thereto.*

91. Da Silva's statement detailed multiple incidences of the plaintiff verbally and emotionally abusing her special education students, neglecting the needs of those students, failing to teach lessons, engaging in favoritism among the students, losing her temper and engaging in inappropriate behavior in front of and with her students such as yelling at them and muttering "Jesus help me" over and over again, referring to her students as retarded, stupid and idiot, telling her students "I can't teach you people," referring to her students in their presence as "this mess," making negative comments in the class about students' mothers, and reading the Bible to herself during class time. *Deposition Exhibit MMM, annexed to the Affirmation of Mark C. Rushfield as Exhibit B thereto.*

92. Prior to March 3, 2003, DaSilva had not engaged in any conduct that the plaintiff considered to indicate that she had any racial bias against the plaintiff. *Transcript of Deposition Testimony of Plaintiff at page 201.*

93. Though claiming that all of the allegations made against the plaintiff by DaSilva in her March 3, 2003 memo were false, the plaintiff could provide no reason why DaSilva would have made

these false statements about her. *Transcript of Deposition Testimony of Plaintiff at page 202.*

94. As the conclusion of the 2002-2003 school year approached, Heritage Jr. High School Principal Raiti communicated to Bivona that he had received complaints from a teachers aide or aides and, perhaps, parental complaints about the plaintiff concerning her management of the class. He told Bivona that he was not happy with the plaintiff's performance, that she was not working out and that he was going to recommend the termination of her employment. Bivona told him that she had performed a single observation of the plaintiff, that it showed improvement by the plaintiff , but that Bivona still had concerns about the plaintiff and did not consider the plaintiff a particularly good teacher based upon what she had seen and what was being reported to her by Special Education Department staff members CSE Sub-Chair Toby Zodicoff and CSE Chair Agatha Bucci, each of whom had reported to Bivona in substance that the plaintiff was not performing the duties of a special education teacher to the Special Education Department's standards, and that she would support his decision. *Bivona Affidavit at ¶ 22.*

95. In late May of 2003, Principal Raiti told the plaintiff that he would be recommending the termination of her employment. *Transcript of Deposition Testimony of Plaintiff at pages 227-228.*

96. In or about May or June of 2003, the administrators at Heritage and Bivona agreed upon a Teacher Evaluation for the period of January of 2003 to June of 2003 (mistakenly dated as "9/02 to 1/03"),  for the plaintiff, which the plaintiff signed on June 24, 2003, which rated the plaintiff with grades of "2" in 8 criteria, "3" in 13 criteria and "4" in 6 criteria; rating her as "1" for unobserved in 1 criteria. *Bivona Affidavit at ¶24 and Exhibit N thereto.*

97. Bivona had no conversations about the plaintiff with then District Superintendent of Schools R. Nick Johns at the end of the 2002-2003 school year. *Transcript of Deposition Testimony*

21

*of Cheryl Bivona at pages 73-74.*

98. By letter dated May 23, 2003, then District Superintendent of Schools R. Nick Johns advised the plaintiff that he would be recommending her termination effective at the close of business on July 28, 2003 to the Board of Education on June 23, 2003. *Transcript of Deposition Testimony of Plaintiff at pages 226-227 and Defendants' Exhibit DD, attached to the Affidavit of Mark C. Rushfield as Exhibit E thereto.*

99. The plaintiff's position at Heritage was posted to be filled and Bivona interviewed and hired Katherine Rebich that summer to teach the class that the plaintiff had taught during the 2002-2003 school year. A parent had agreed to a settlement of an impartial due process hearing under the Individuals With Disabilities In Education Act that involved her child being assigned to this class based upon the express condition that Ms. Rebich would have the class. *Bivona Affidavit at ¶ 24.*

100. After appeals by the plaintiff, then District Superintendent R. Nick Johns agreed to vacate the plaintiff's termination. *Complaint ¶ 28.*

101. In August of 2003, Bivona learned from the District's Assistant Superintendent for Human Resources, W. John Knight, that the plaintiff was returning because there was no teacher assistance plan in place prior to the recommendation for her termination and explained to Assistant Superintendent Knight that she had filled the position that the plaintiff had occupied at Heritage and that a settlement of an impartial due process hearing required that the newly hired teacher have that class. *Bivona Affidavit at ¶25.*

102. Bivona had no familiarity with teacher assistance plans or their necessity at the time she learned that the plaintiff was returning because there was no teacher assistance plan in place prior to the recommendation for her termination. *Bivona Affidavit at ¶25.*

103. Bivona looked for a position for the plaintiff and discovered that there was a special education class at Meadow Hill Elementary School which not only had younger students than the plaintiff had taught at Heritage, but students who were higher functioning than those she had taught at Heritage so that it would be an easier class for the plaintiff and so informed Assistant Superintendent Knight. *Bivona Affidavit at ¶25.*

104. Then District Superintendent of Schools R. Nick Johns agreed to transfer the plaintiff to Meadow Hill Elementary School for her third year and the plaintiff was assigned to the vacant special education position that Bivona had found for the plaintiff at Meadow Hill Elementary School for the 2003-2004 school year. *Complaint ¶ 28; Bivona Affidavit at ¶ 26.*

105. The principal at Meadow Hill Elementary School for the 2003-2004 school year was Dr. Johnetta Neal ("Dr. Neal"), a Black woman who was serving as the new principal of that school, having first commenced employment with the District on July 1, 2003. *Neal Affidavit at ¶¶ 1, 2 and 4.*

106. Dr. Neal received a memo from then Superintendent R. Nick Johns on or about August 25, 2003, confirming that the plaintiff was being transferred to Meadow Hill to teach a special education class, that the plaintiff had some performance issues at Heritage, and that Heritage's setting and unique factors there may have contributed to her performance problems; Dr. Neal was further advised therein that the move was being made in the hope that the plaintiff would be successful in Meadow Hill and that Dr. Neal was to become knowledgeable of the contents of the plaintiff's assistance plan, was to review identified shortfalls with the plaintiff within the first two weeks of school, was to observe her at least four times in the first two months and was to augment her assistance plan to respond to any deficiencies that might be identified. *Neal Affidavit at ¶ 5 and Exhibit A thereto.*

107.  Dr. Neal considered the reference to four observations to not require that four formal classroom observations (including viewing a whole lesson, conducting pre and or post-observation conferences and writing up a formal evaluation) be done within the first two months of school, but rather that these were to be spot observations (i.e., entering the class unannounced in advance to observe a portion of a lesson to assure that students are on task, that teacher objectives are on the bulletin board and that lesson plans are being followed), which Dr. Neal and her staff performed on a regular basis for all teachers, including the plaintiff; she otherwise went by the guidelines in the collective bargaining agreement, which required a minimum of three formal classroom observations during the school year for non-tenured teachers. *Neal Affidavit at ¶ 5 and Exhibit A thereto*.

108.  After reviewing the August 25, 2003 Memo, Dr. Neal understood that she was being tasked to attempt to help the plaintiff to become successful at Meadow Hill and did not interpret Superintendent Johns' August 25, 2003 Memo as communicating an instruction to confirm any determination that had been reached at Heritage as to whether the plaintiff was a successful teacher. *Neal Affidavit at ¶ 6*.

109.  Terry D. Lucas ("Lucas")was an Assistant Principal for the Meadow Hill Elementary School during the 2003-2004 school year. She and Dr. Neal were primarily responsible for overseeing and assisting the plaintiff  during the 2003-2004 school year. *Terry Lucas Affidavit ("Lucas Affidavit")at ¶ 1.*

110.  Neither Lucas nor Dr. Neal were ever given any instruction by anyone to treat the plaintiff in any adverse way or not fully try to help her or not fairly review her performance, or to create a record that could be used to support a termination of the plaintiff or a denial of tenure to her either during or at the end of the school year *Neal Affidavit at ¶ 6; Lucas Affidavit at ¶ 7.*

111.  Lucas was directed by Dr. Neal to do everything she could as an assistant principal to

help the plaintiff. *Lucas Affidavit at ¶ 7.*

112. Neither Lucas nor Dr. Neal ever learned any details, from Bivona or anyone else, as to why there had been an earlier recommendation to terminate the plaintiff while she was at Heritage and both determined that they would gauge her performance solely on what they observed regarding the plaintiff's performance at Meadow Hill. *Neal Affidavit at ¶ 8; Lucas Affidavit at ¶ 6; Bivona Affidavit at ¶ 27.*

113. After receiving the August 25, 2003 Memo, Dr. Neal sought to review the plaintiff's assistance plan as referred to in the August 25, 2003 Memo. Not being able to locate such a document, she made a request to Dr. Johns' office for the plaintiff's assistance plan and instead received a memo from Assistant Superintendent for Human Resources Knight, dated September 3, 2003, which advised her that one had not been discovered at the District's Human Resources Office and that, if one did not exist, one should be prepared. She thereafter learned that no such assistance plan had been prepared and that she would have to draw up such a plan for the plaintiff. *Neal Affidavit at ¶ 7 and Exhibit B thereto.*

114. In order to assist the plaintiff in addressing performance issues, even though the plaintiff was not entitled to participate in the internship program established under the collective bargaining agreement between the Teachers Union and the District, under which  mentoring tenured teachers were assigned by the Teacher's Union to help new probationary teachers, at the very beginning of the 2003-2004 school year, by letter dated September 4, 2003, Dr. Neal requested of then Superintendent Johns that a mentor be assigned to the plaintiff, and tenured teacher Emily Melendez ("Melendez"), was so assigned by the Teachers Union and began performing this function on September 10, 2003. *Neal Affidavit at ¶¶10 and 11 and Exhibits C, D and E thereto; Lucas Affidavit at ¶ 6; Transcript of Deposition Testimony of Plaintiff at pages 302-303 and 323.*

115. Melendez, a reading teacher assigned by the plaintiff's Union to serve as her mentor, assisted the plaintiff in attempting to master such basic duties as in writing and presenting lesson plans, but was not qualified to assist the plaintiff by educating her as to the particularized duties required of a special education teacher; consequently Dr. Neal requested on the first day of school that Meadow Hill's senior special education teacher and team leader for special education, Denise Bernstein ("Bernstein"), voluntarily offer support to Ms. Simpson, including assisting the plaintiff with Orton-Gillinghan teaching methodology, observing the plaintiff's class and providing the plaintiff with helpful hints in gaining control of the class and teaching the lessons to the class; Bivona later in the Fall requested Bernstein to assist the plaintiff with differentiation of instruction in the classroom, i.e., to group the students in the plaintiff's class and show the plaintiff both how to group them and how to get the different groups of students going so that they could be instructed in the reading process according to their individual abilities, instead of as a whole group. *Neal Affidavit at ¶ 11; Transcript of Deposition Testimony of Plaintiff at pages 303 and 310-312; Transcript of Deposition Testimony of Denise Bernstein at pages 12-13,39-40 and 47; Transcript of Deposition Testimony of Cheryl Bivona at pages 102-104.*

116. Bernstein had taught most of the students in the plaintiff's class the prior year and had been successful in maintaining control and management of the class during that year through a firm discipline plan, which kept classroom management problems to a minimum. *Transcript of Deposition Testimony of Denise Bernstein at pages 8-10.*

117. For the students that the plaintiff was teaching at Meadow Hill during the 2003-2004 school year, the ability to manage the behavior of the students was very important and even before the first day of school, Bernstein confirmed that fact to the plaintiff, discussed classroom management with the plaintiff, showed the plaintiff how Bernstein exercised classroom management and provided

26

the plaintiff with suggestions as to how she could manage the behavior of the students effectively. *Transcript of Deposition Testimony of Denise Bernstein at pages 30-31.*

118. Dr. Neal, Lucas and Bivona were involved in preparing and implementing a teacher assistance plan for the plaintiff with the participation of her Union, which was completed on November 10, 2003, though various portions of the completed plan, including training and the provision of materials, the assignment of Bernstein to help the plaintiff with Orton-Gillinghman training and assistance in instruction techniques, the assignment of a mentor, and the provision of the book "Discipline with Dignity" for the plaintiff to study, were implemented in September and October of 2003, prior to the final version of the teacher assistance plan for the plaintiff being adopted. *Transcript of Deposition Testimony of Plaintiff at pages 302-315; Bivona Affidavit at ¶ 26 and Exhibit O thereto; Neal Affidavit at ¶ 12 and Exhibit F thereto; Lucas Affidavit at ¶ 8.*

119. Commencing early in the 2003-2004 school year, parents in the special education class that the plaintiff was teaching began expressing concerns and complaints to Dr. Neal and Lucas regarding their children's education in the plaintiff's class; particularly concerning classroom management and concerns for the safety of their children and their learning. Dr. Neal and Lucas also began developing concerns of their own in this regard based upon the spot checks they were making and the reports of assistant principals and other teachers as to the problems they were observing as to classroom management and the lack of effective teaching in the plaintiff's class, as well as what they all could hear outside the classroom as they walked the halls or was reported to them by others, i.e., that the plaintiff was often engaging in arguments with her students, fights often were breaking out in her class, and students were often seen running out of her room and around the halls. *Neal Affidavit at ¶ 13; Lucas Affidavit at ¶¶ 9-11.*

120. From the beginning of the school year, Lucas and Dr. Neal observed these ongoing

classroom management problems of the plaintiff personally, such as students running around the

classroom, throwing papers, fighting and engaging in other misconduct while the plaintiff was yelling

at them, but perceptively unable to control their behavior. *Lucas Affidavit at ¶¶ 9-11; Neal Affidavit*

*at ¶¶13 and 25.*

121. From the beginning of the 2003-2004 school year and through to its conclusion, teachers

whose classrooms were in the vicinity of the plaintiff's, such as Bernstein and Octavia Nicholas, a

number of whom complained to Lucas or Dr. Neal, observed that the plaintiff was routinely unable

to manage the students in her classroom, i.e., students were not obeying or listening to the plaintiff,

were running out of the room and around the hallways and were engaging in fights, assaulting each

other and other misconduct which the plaintiff was visibly incapable of controlling or unwilling to

control; this did not happen in any other classes at Meadow Hill. *Transcript of Deposition Testimony*

*of Denise Bernstein at pages 10-12, 13-14, 18-23, 30, 32 and 47-48;  Transcript of Deposition*

*Testimony of Octavia Nicholas at pages 24, 26,31-32, 33 and 34; Lucas Affidavit at ¶ 12; Neal*

*Affidavit at ¶¶ 13 and 23.*

122. A teachers aide, Pamela Stuit, and the teaching assistant in the plaintiff's class, Ms.

Santiago, both reported on an ongoing basis to Dr. Neal and Lucas throughout the school year that

the plaintiff was unable to control the class and that the students in the class were not being

challenged academically. *Neal Affidavit at ¶¶ 13 and 23; Lucas Affidavit at ¶¶ 12 and 13.*

123. Students in the plaintiff's classroom would often complain to Lucas, school psychologist

Guy Delisfort and/orother members of the Meadow Hill services support team and general education

teacher Nicholas that Ms. Simpson was not teaching them and that her classroom was out of control;

they complained to Delsifort that they did not feel safe in the class; they left the plaintiff's class and

complained to Nicholas throughout the school year up until the termination of the plaintiff's

employment that they didn't like the plaintiff, that the plaintiff didn't know what she was doing, that the plaintiff didn't care about them and that they didn't want to be in the plaintiff's class. *Lucas Affidavit at ¶ 10; Guy Delisfort Affidavit ("Delisfort Affidavit") at ¶ 8; Transcript of Deposition Testimony of Octavia Nicholas at pages 24-26 and 32.*

124. School psychologist Delisfort and other members of the school's support services team and Lucas were often called to come to the plaintiff's class to engage in crisis interventions with the plaintiff's students; far more often than with other teachers. *Delisfort Affidavit at ¶¶ 9-11; Lucas Affidavit at ¶ 9.*

125. The plaintiff acknowledged to Meadow Hill teacher Octavia Nicholas, to whom she often went for advice on how to manage her class, that she could not control her students. *Transcript of Deposition Testimony of Octavia Nicholas at pages 17-18 and 21.*

126. The plaintiff acknowledged to Teachers Union Head Delegate at Meadow Hill Laurie Colacchio after the teachers assistance plan had been adopted and sometime in the Spring of 2004 (i.e., around March or April of 2004) that she needed help with managing her classroom. *Transcript of Deposition Testimony of Laurie Colacchio at pages 14-15 and 21-22.*

127. Teachers Union Head Delegate at Meadow Hill Laurie Colacchio briefly observed the plaintiff's class occasionally to see how management of the classroom was proceeding and on 5 or 6 occasions observed that the students in the class were totally ignoring the plaintiff's directions and that the plaintiff could not get them on task. *Transcript of Deposition Testimony of Laurie Colacchio at pages 18-20.*

128. Because of these complaints, Dr. Neal and Lucas had a number of counseling sessions with the plaintiff concerning her apparent inability to manage her class, during which the plaintiff commonly responded that the children were unmanageable. *Lucas Affidavit at ¶ 14; Neal Affidavit*

*at ¶ 13, 17, 18, 42 and 43.*

129. According to District records,  during the plaintiff's 2003-2004 school year at Meadow Hill Elementary School, there were 138 student disciplinary referrals from the plaintiff's class, representing 19% of the total of the disciplinary referrals attributable to all 67 teachers at Meadow Hill; the closest teacher's total of disciplinary referrals for that year was 46 referrals. *Affidavit of Mary Lou  Botsford ("Botsford Affidavit") at ¶¶ 3- 9.*

130.  During the plaintiff's deposition, of the 98 disciplinary referrals from her 2003-2004 classroom presented for her inspection, the plaintiff admitted that she personally issued 74, alone constituting over 10% of the school's total for that year and 28 more then the next closest teacher. *Transcript of Deposition Testimony of Plaintiff at pages 540 -554.*

131.   The exorbitant amount of disciplinary referrals from the plaintiff's class during the 2003-2004 school year and the fact that they were being issued by the plaintiff on an almost daily basis –  reflecting the plaintiff's inability to manage her class without outside assistance – was the continuous subject of ongoing concern and discussion among the school administrators at Meadow Hill Elementary  School. *Neal Affidavit at ¶¶ 24-25; Lucas Affidavit at 19.*

132.   On or about November 20, 2003, after observing fights among students occurring in the plaintiff's classroom on November 19, 2003, Dr. Neal reviewed the Meadow Hill Elementary School's disciplinary removal and referral records for the plaintiff's class and discovered that during the  approximately 11 weeks that had passed since the beginning of the school year, there had been 71 student disciplinary removals or referrals from the plaintiff's class, much more than any other teacher in the school had issued.  This led Dr. Neal, on her own volition, in an effort to convince Bivona to remove the plaintiff from her classroom , to issue a memo dated November 20, 2003 to Bivona in which Dr. Neal stated that the plaintiff's class was "at the brink of explosion" and that the

plaintiff "was not a match for her current teaching assignment." *Neil Affidavit at paragraph 25 and Exhibit L thereto.*

133. Bivona performed a formal classroom observation of the plaintiff on November 26, 2003, which ran for an hour and was the longest observation Bivona had ever done, during which Bivona was very dissatisfied with the plaintiff's teaching and management of her class as the students did not pay attention to the plaintiff and were openly disrespectful to her at times and the plaintiff was unable to keep them on task.  Bivona considered this the worst classroom performance by a teacher she had ever witnessed. *Bivona Affidavit at ¶ 30 and Exhibit Q thereto; Neil Affidavit at ¶ 13 and Exhibit M thereto.*

134. Following the observation, in an effort to assist the plaintiff, Bivona reexamined the records of the students in the plaintiff's class and provided details to the plaintiff in her Observation Report as to how the plaintiff could better group the students according to their reading levels in the class for purposes of differentiated instruction for a lesson such as the one Bivona had observed and how the students in those groups could be best instructed and also suggested a behavior modification point system, stricter management concerning bathroom breaks for the students and better utilization of the aides and teaching assistants in the class. *Bivona Affidavit at ¶ 31 and Exhibit Q thereto; Neil Affidavit at ¶ 13 and Exhibit M thereto.*

135. By memo to Bivona dated January 9, 2004, the plaintiff provided responsive comments to Bivona's November 26, 2003 Observation Report.  Though the plaintiff submitted a response detailing what she disagreed with in this Observation Reprt, the plaintiff did not therein substantially disagree with the statement in the Observation Report as to what Bivona had observed during her class on November 26, though she did claim that the students in her class had been grouped according to their reading levels.  There was no disagreement expressed with Bivona's comments concerning

the serious classroom management issues presented by the behavior of the plaintiff's students and her lack of effective attention to that behavior on November 26, 2003. *Bivona Affidavit at ¶ 32 and Exhibit R thereto; Transcript of Deposition Testimony of Plaintiff at pages 397-398 and 404-405.*

136. On December 18, 2003, Lucas performed a formal classroom observation of the plaintiff. Lucas had been provided no instructions by Dr. Neal concerning what should be focused upon during the observation or what should be placed in the observation report and considered the lesson given by the plaintiff to be the worst she had ever observed in her career; the children were not only not engaged in the class, but were mocking the plaintiff, the plaintiff was speaking in a manner and choosing words or phrases that neither the children nor Lucas understood, the plaintiff moved back and forth between subjects and points even when it was clear that the children were not following her and the plaintiff taught the lesson as a group lesson as if it was a regular education class, rather than a special education class requiring the plaintiff to differentiate among the students in order to address their individualized separate needs. *Lucas Affidavit at ¶ 20 and Exhibit B thereto; Neal Affidavit at ¶¶ 28-29 and Exhibit N thereto.*

137.   After taking a full week to prepare the "Suggested Behaviors, etc." portion of the Observation Report concerning the December 18, 2003 formal classroom observation of the plaintiff, Lucas completed her Observation Report, which was very critical of the plaintiff's classroom management and instruction skills and actions, but which also provided detailed suggested behaviors to the plaintiff as to how to improve her classroom management and instruction. *Neil Affidavit at ¶¶ 29-31 and Exhibit N thereto; Lucas Affidavit at ¶¶ 20-21 and Exhibit B thereto.*

138.   The plaintiff's response to the December 18, 2003 Observation Report provided a "Thank you" to Lucas "for the positive comments in my recent observation" and disagreed that her students were inattentive and that there was disorganization during the class, but even though where

32

she would disagree with this observation report, she would put her disagreements in her comments, she did not otherwise directly respond to what Lucas stated that she had observed. *Transcript of Deposition Testimony of Plaintiff at page 420; Exhibit N (last page) to Neal Affidavit.*

139.  The plaintiff acknowledges that she mispronounced the word "character" in a way that was unclear to her students during the December 18, 2003 observation, that one of her students had his head down on the desk during the December 18, 2003 observation and that she should have been planning more creative and interactive activities as suggested by Lucas. *Transcript of Deposition Testimony of Plaintiff at pages 416, 417 and 419.*

140.  Upon reviewing Lucas's December 18, 2003 Observation Report concerning the formal classroom observation she performed upon the plaintiff, Dr. Neal concluded that Lucas was seeing the same kinds of classroom management and instruction deficiencies in the plaintiff that Dr. Neal had observed during her prior formal classroom observation of the plaintiff in September and during her routine spot observations of the plaintiff's class and that, despite the efforts of various staff members and the implementation of the teacher assistance plan, the plaintiff's performance was not improving. *Neil Affidavit at ¶32.*

141.  Lucas' spot observations of the plaintiff 's classroom performance after her provision of her December 18, 2003 Observation Report to the plaintiff did not indicate to Lucas that the plaintiff ever adopted any of Lucas' suggestions. *Lucas Affidavit at ¶ 21.*

142. In January of 2004, Bivona, Lucas and Dr. Neal participated in the preparation of the plaintiff's Teacher Evaluation Report covering the first half of the plaintiff's 2003-2004 school year at Meadow Hill Elementary School. Dr. Neal was the deciding administrator and decided to give the plaintiff a standard grade of "4" in eight criteria, a well below standard grade of "2" in two criteria and a substandard grade of "3" in the remaining criteria.  *Neal Affidavit at ¶ ¶ 33- 38 and Exhibit P*

*thereto.*

143.  The grades that Dr. Neal gave to the plaintiff in the Teacher Evaluation Report for the first half of the 2003-2004 school year were substantially better than Lucas recommended that the plaintiff be given and the higher grades were given to the plaintiff by Dr. Neal in an effort to avoid discouraging her and to give her some incentive to improve. *Neal Affidavit at ¶¶ 34 and 37; Lucas Affidavit at ¶22.*

144.  On February 5, 2004, Bivona had issued a memo to all special education teachers, including the plaintiff, requiring that referral forms to the Committee on Special Education ("CSE") for major changes in placement of special education students be returned to Bivona's office by February 26, 2004 in order for programs for those students to be changed.  In late January of 2003, following up upon a January 23, 2004 request by physician Dr Susan Pavlick that a student in the plaintiff's class, A.R., be referred for a Board of Cooperative Education Services ("BOCES") placement, Bivona had spoken to Meadow Hill School Social Worker Rafael Perez who advised her that the plaintiff had agreed to refer A.R. to the CSE for a possible program change.  When Bivona did not receive the referral for A.R. by February 26, she sent a memo to the plaintiff dated March 5, 2004 inquiring about the request for the major change for A.R. and about why Bivona had not received the referral by the February 26 deadline. *Bivona Affidavit at ¶ 36 and Exhibit T thereto.*

145. The plaintiff responded to Bivona's March 5, 2004 memo not to Bivona, but with a memo to Dr. Neal dated March 24, 2004, in which she mischaracterized Bivona's February 5, 2004 memo as creating an obligation upon the plaintiff to provide Bivona with a referral form only if she personally (as opposed to, for example, an outside physician or the school social worker) was recommending a change of placement for the student.  This was not what Bivona's February 5, 2004 memo said. *Bivona Affidavit at ¶ 36 and Exhibits T and U thereto.*

34

146. The plaintiff was responsible for seeing that testing and scores for various of her students, i.e., P.W. and K.(C.)S. were to be completed, respectively, before February of 2004 and prior to February 10, 2004, but the plaintiff failed in performing these obligations; which failure was confirmed by a memo from Dr. Neal dated February 10, 2004. *Transcript of Deposition Testimony of Plaintiff  at pages 413-415; Neal Affidavit at ¶ 38 and Exhibit Q thereto.*

147.   At Meadow Hill Elementary School, there was a "support services team" made up of the school social worker, the school nurse, the  school psychologist, the school counselor and the school-based caseworker, who would assist students and families experiencing emotional, psychological, social and/or developmental difficulties which might affect a student's academic performance and would provide support to teachers in dealing with those difficulties. *Neil Affidavit at ¶ 39; Delisfort Affidavit at ¶ 5.*

148.   During the 2003-2004 school year, members of the support services team who were regularly engaged in counseling students in the plaintiff's class commenced receiving reports in September of 2003 and continuing thereafter from the students they were counseling that the plaintiff's class was dangerous and noisy, that the students did not feel safe in the class and that they had a hard time learning anything there. *Delisfort Affidavit at ¶¶  8 and 10-11.attached to the Affirmation of Mark C. Rushfield as Exhibit C thereto*

149.   The plaintiff's inability to control her class became an ongoing and significant subject of meetings of the services support team commencing in September of 2003 and, as the situation in the plaintiff's class  had not improved by the end of the first half of the school year, in early February of 2004, in a major unprecedented intervention involving four counselors, members of the services support team formally contacted Dr. Neal to secure her permission to hold a meeting with the plaintiff's students every morning to address classroom management issues; which permission was

granted. *Neal Affidavit at ¶ ¶ 39 -41 and Exhibits R, S and T thereto; Delisfort Affidavit at ¶ ¶ 11-12 and Exhibits B and C thereto.*

150.  The support services team meeting program designed for the plaintiff's class included a 10 minute morning intervention each morning during which team members engaged in efforts to communicate messages of responsibility and discipline to the students, as well as  efforts by the support services team to enlist the assistance of senior teacher Bernstein to provide suggestions as to how the plaintiff could better deal with her class. It continued  from February  25, 2004 beyond the original expiration date of March 15, 2004 into May of 2004, when it was discontinued because other obligations made continuation of the program impracticable and it had not appeared to succeed in remedying the plaintiff's classroom management issues. *Delisfort Affidavit at ¶ 13; Transcript of Deposition Testimony of Denise Bernstein at page 38; Transcript of Deposition Testimony of Plaintiff  at pages 370-372 and 387.*

151.  The services support team meeting program was never considered to be necessary for, nor offered to. any other teacher than the plaintiff and provided the plaintiff with an extraordinary amount of classroom management support beyond what other teachers at Meadow Hill Elementary School had ever received. *Delisfort Affidavit at ¶ 11; Transcript of Deposition Testimony of Denise Bernstein at pages 36-37.*

152. With the approval of Bivona and Dr. Neal, the District had sent the plaintiff for training relating to the administration of the New York State Alternative Assessments on October 29, 2003. *Bivona Affidavit at ¶40 and Exhibit W thereto.*

153. On or about March 18, 2004, Bivona received a March 18, 2004 memo from CSE Chair Bucci in which she provided Bivona with a narrative of a January 27, 2004 meeting she'd held with the plaintiff regarding the Alternative Assessment that the plaintiff was required to prepare for each

of her students and additional information concerning the scoring of a datafilio which was part of the requirements for the Alternative Assessment (in that case for student P.W.). The narrative stated that the plaintiff had not done the required work and collected the required evidence for the datafilio for the integrated learning section/requirement of the Alternative Assessment and that while Ms. Bucci had attempted to explain what was required, there was not sufficient time remaining in the assessments period to fulfill the requirement.  At the bottom of the narrative, by a "Note" portion for March 18, 2004, Ms. Bucci informed Bivona that the Alternative Assessment submitted for P.W. by the plaintiff, which is reviewed and scored by BOCES, had been deemed unscoreable by BOCES and, as a consequence received a score of zero. This was the only zero score that the District received. In light of the plaintiff having received the Alternative Assessment training as recently as the prior October 29, Bivona considered this failure by the plaintiff and the resulting zero score to evidence professional neglect on her part. *Bivona Affidavit at ¶40 and Exhibit X thereto.*

154. The plaintiff  acknowledges that a zero was scored upon the Alternative Assesssment she prepared. *Transcript of Deposition Testimony of Plaintiff  at page 396.*

155. In February and March of 2003, a number of letters from parents and from an outside service coordinator concerning three students in the plaintiff's class came to Bivona's and Dr. Neal's attention.  One was a letter from Ms. A.W., the parent of student J.W., addressed to Dr. Neal, in which the parent requested that the current placement of her son in the plaintiff's class be reviewed immediately and complained that since her son's placement in the plaintiff's class she had seen a steady downhill decline in his behavior and emotional and social well-being.  In that letter, she criticized the "lack of discipline in the classroom," reporting that her son complained of "too much distractions, students arguing and fighting with one another," that she was told that "students repeatedly throw objects at each other such as pencils, paper and paper clips and displayed

disrespectful behaviors such as name calling and being slapped on the back of the head by each other that goes unnoticed and unaddressed." She stated that she believed that J.W.'s recent outbursts were brought on by her son's "being repeatedly taunted and antagonized by other students and repeatedly disregarded by the teacher to the point that he is taking matters into his own hands," that her son expressed feeling "singled out" by the plaintiff. *Bivona Affidavit at ¶38 and Exhibit V thereto; Neil Affidavit at ¶ 42 and Exhibit  U thereto.*

156. The plaintiff was the only special education teacher that Bivona had ever received parental complaints about. *Transcript of Deposition Testimony of Cheryl Bivona at pages 120-121.*

157. On or about March 19, 2004,  Bivona  received another memo from CSE Chair Bucci, in which she advised Bivona  that she wished to meet with Bivona regarding the plaintiff being unfamiliar with the IEP, especially the medical needs, of a student in her class, of the plaintiff being unaware of the physical therapy needs of that student and of this student's parents being concerned with the lack of classroom management skills of the plaintiff, with the student expressing that she felt unsafe in the classroom.  In the follow-up meeting, Ms. Bucci confirmed to Bivona  her impression that despite the plaintiff's training, her two prior years of service as a special education teacher in the District and the actions taken under the teacher assistance plan, the plaintiff appeared to remain generally unaware of her responsibilities as a special education teacher in the District, including having knowledge of the applicable procedures where a student was being referred for consideration of a program change and of her need to be familiar with the IEPs of her special education students. *Bivona Affidavit at ¶41 and Exhibit Y thereto.*

158.  On March 26, 2004, Assistant Principle Anne Lytle ("Lytle") performed a formal classroom observation of the plaintiff's class and, without receiving any instructions from Dr. Neal concerning what should be placed or emphasized in the report,  issued the fourth and final

Observation Report of a classroom observation for the 2003-2004 school year for the plaintiff.  *Neal Affidavit at ¶ 44 and Exhibit W thereto.*

159. Lytle's Observation Report was very critical of the plaintiff's classroom management and instruction, noting that while classroom rules were posted, they were partially covered, student outbursts interfered with the lesson, no disciplinary procedures were implemented or consistently followed, the plaintiff seemed to lack control of the classroom situations and behaviors, students were inattentive and did not remain on task, that the class was not well behaved and that some student misbehavior seem to be ignored by the plaintiff; that student attention and participation in the lesson was low and that there was no evidence of a excitement or energy in how the plaintiff presented the lesson .  *Neal Affidavit at ¶ 45-46 and Exhibit W thereto.*

160. On or about May 1, 2002, Master Sergeant Cozzupoli, a volunteer mentor serving as a school-based big brother for a student in the plaintiff's class, W.R., who visited the plaintiff's classroom once or twice a month, submitted a "Memorandum for Record" dated May 1, 2004, in which he reported that he'd witnessed behavior in the plaintiff's classroom on April 28, 2004  that he considered to be "not excusable,  " that in the plaintiff's class "there are always children running around, speaking out, and yelling at each other or the teacher," that an incident involving W.R. occurred in the classroom on April 28 involving W.R. and other students during which the plaintiff was uninterested and allowed the children in the class to get loud and be abusive and that the plaintiff took no effective action even when the students began being abusive toward Sgt. Cozzupoli. Sgt. Cozzupoli further reported that in the plaintiff's classroom, children often behave poorly and that the plaintiff "never seems to have control over them" and that the students "are constantly running around, yelling and being disrespectful."  Dr. Neal credited this report as it conformed to prior observations she and her administrators had made and reports she had received from the plaintiff's

teacher aid, the plaintiff's teaching assistant and from other teachers. *Neal Affidavit at ¶49 and Exhibit Y thereto; Transcript of Deposition Testimony of Plaintiff at pages 470-472* .

161. The plaintiff acknowledges that children in her class were commonly yelling at each other. *Transcript of Deposition Testimony of Plaintiff at pages 531-532.*

162. Lucas observed that the plaintiff's performance did not improve in the second half of the school year and that the plaintiff's classroom management issues and inability to teach the children in her class during the second half of the school year was no different than what she witnessed during the first half; Lucas concluded that the plaintiff was the worst teacher she'd ever dealt with. *Lucas Affidavit at ¶¶ 23 and 24.*

163. Lucas and Dr. Neal participated in the preparation of the final Teacher Evaluation Report for the plaintiff, in which Dr. Neal graded the plaintiff with a "2" in the majority of criteria and graded her a substandard "3" in the remainder.  Lucas would have graded the plaintiff more harshly then Dr. Neal did. *Neil Affidavit at ¶ 52 and Exhibit AA thereto; Lucas Affidavit at ¶ 25and Exhibit D thereto.*

164. Both Dr. Neal and Bivona independently reached the conclusion that the plaintiff should be denied tenure and both independently made that recommendation to the District's Human Resources Department  for the Superintendent of Schools, Antoinette Saturnelli, to act upon.  Dr. Neal's recommendation formed the basis for the eventual decision of Superintendent of Schools Saturnelli to recommend to the District's Board of Education the denial of tenure to the plaintiff and the termination of her employment, which denial and determination were effectuated by the District's Board of Education. *Neal Affidavit at ¶ 50 and Exhibit Z thereto; Bivona Affidavit at ¶ 42; Transcript of Deposition Testimony of Antoinette Saturnelli at pages 9-20; Botsford Affidavit at ¶ 12.*

165.  The District's Human Resources Department prepared a letter to the plaintiff for Dr.

Saturnelli's signature pursuant to New York Education Law § 3031 setting forth 4 reasons for the termination of the plaintiff's probationary employment. *Transcript of Deposition Testimony of Antoinette Saturnelli at pages 15-17 and Defendants Deposition Exhibit JJJ attached to the Affirmation of Mark C. Rushfield as Exhibit F thereto.*

166. Bivona had been involved in the hiring, reviews or recommendations for tenure of many Black persons in the District. In terms of successfully recommending Black teachers or support personnel for hire, among those Bivona recommended for hire who were in fact hired by the District are: (1) Karriem Bunce, a Black woman hired as a special education teacher by the District effective September 1, 2001, (2) Tameka Gregg, a Black woman hired as a special education teacher by the District effective September 1, 2001, (3) Marge Bell, a Black woman hired as a social worker by the District effective September 1, 2001, (4) Christa O'Neill, a Black woman hired as a speech teacher by the District effective March 19, 2003; (5) Andre Green, a Black man hired as a special education teacher by the District effective September 1, 2004; (6) Sharon Edwards, a Black woman hired as a special education teacher by the District effective September 1, 2005 and (7) Guy Delisfort, a Black man from Haiti employed at the Meadow Hill as its school psychologist whom Bivona recommended be hired as a member of the hiring committee for the District in 1997. Of these seven persons, all remain employed by the District, except for Mr. Green, who had to leave employment when it was determined he was not certified. *Bivona Affidavit at ¶ 44; Dellisfort Affidavit at ¶ 5.*

167. Bivona successfully recommended for hire Melissa J. Winfield, a Black woman hired as a special education teacher, to replace the plaintiff in teaching the class she taught during her last year at Meadow Hill. Ms. Winfield's position was initially made a one year full-time non-tenure track position and as of the 2006-2007 school year, her position is on a tenure track. *Bivona Affidavit at ¶ 45.*

168. During the 2005-2006 school year, Bivona participated with Meadow Hill Principal Barbara Weiss in preparing two Teacher Evaluation Reports for Ms. Winfield, for September 2005 to January of 2006 and for January of 2006 to June of 2006.  As reflected in these Reports, Principal Weiss and Bivona  agreed that Ms. Winfield was a very good teacher, warranting grades of 4s and 5s in her evaluations. *Bivona Affidavit at ¶45 and Exhibit Z thereto*.

169. Among the Black persons Bivona has  recommended for tenure in the District were Black female special education teacher Joyce Pemberton (who it was discovered was not certified and could not continue in employment),  Karriem Bunce (who received tenure), Christa O'Neill (who received tenure), and Claudetter Gerald, a Black woman who was a special education teacher at the Newburgh Free Academy. *Bivona Affidavit at ¶46.*

170. Claudetter Gerald was subsequently recruited by Bivona to apply for a posted promotional position of Director of Special Education for the secondary level when it was decided to break her Director position up into two positions, one for the elementary level (that Bivona retained) and one for the secondary level. With Bivona's strong recommendation, Ms. Gerald secured that position in or about July of 2005 over the other finalist, who was Caucasian. She now shares the title of Director of Special Education with Bivona. *Bivona Affidavit at ¶47.*

171.  During the period of the 2001-2002 through 2003-2004 school years, in which the plaintiff was employed by the District, during which Dr. R. Nick Johns served as Superintendent from September 1, 2002 to February 5, 2004, and Dr. Annette M. Saturnelli served as the Superintendent of Schools thereafter, Dr. Johns successfully recommended four Black teachers and two Black administrators for tenure and Dr. Saturnelli successfully recommended  three Black teachers and two Black administrators for tenure.  *Botsford Affidavit at ¶¶ 10-11.*

WHEREFORE, defendants request that this Court render a summary judgment under Rule

56 of the Federal Rules of Civil Procedure dismissing the Complaint in all respects, granting

judgment to the defendants and granting defendants such other and further relief as the Court may

deem just and proper.

Dated: December 21, 2006

                                        Respectfully submitted,

                                        SHAW & PERELSON, LLP
                                        Attorneys for Defendants


                                        By:_____/S/_____
                                        Mark C. Rushfield, Esq. (MCR0231)
                                        Of Counsel to the Firm
                                        40 So. Roberts Road
                                        Highland, New York 12528
                                        845/691-8100